[No. 22704–1–I. Division One. March 26, 1990.]

NORTHWEST MOTORS, LTD., *Appellant,* v. KENNETH R. JAMES, ET AL, *Respondents.*

*Steven W. Klug,* for appellant.

*Michael M. Hanis,* for respondents.

AGID, J.*—Northwest Motors appeals the trial court's judgment awarding it $2,400 plus interest, but awarding attorney's fees to the defendant, Dr. Kenneth James.

## FACTS

Northwest Motors is an automotive repair shop, specializing in the repair of Jaguars. At the time the dispute involved in this case occurred, James had been a customer with Northwest for 2 years. On May 22, 1984, James brought his 1976 Jaguar XJ6 into Northwest, complaining of a gasoline leak, loss of water from the radiator, and a failed interior lamp. He also asked for an oil change. Upon examination, Northwest employees discovered and replaced a failed fuel cooler and performed the requested service. The bill was $256.14.

Inspection of the car during these repairs showed that there was a loss of cooling system pressure and contamination of the coolant and the engine oil. Talbott Campbell, the owner of Northwest, requested the opportunity to test

---

*Judge Susan R. Agid is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

the engine further because he suspected that it had been dangerously overheated. James promised to return the car in a few days.

James dropped his car off in front of Northwest without an appointment a few days later. He called Campbell later that day and authorized Campbell to test the engine. Campbell's mechanics determined that there was water in the new oil, indicating a blown head gasket, and either a cracked cylinder head or a cracked block. Because he did not yet know the nature of the problem, Campbell did not give a cost estimate. He told James that removing the head to investigate further would take 3 to 5 days, because of other demands on shop time.

Several days later, in early June, the mechanics discovered that the car's problem was a cracked block between each cylinder. Campbell telephoned James with this information and requested that James come to the shop, but James declined. The oral estimate for the job given by Campbell to James was for $2,500, consisting of approximately $500 for a used block and $2,000 for labor for removal and replacement. Campbell testified that he told James that it could take some time to locate a used block, but that a new block, costing three times as much, could be obtained in a few days. James chose the used block.

Campbell testified that no written estimate was given because the conversations were all conducted by telephone. According to Campbell, his employees were not authorized to give estimates. James conceded that he never asked for a written estimate. James testified, and the trial court found, that the only estimate ever given him for the repair work was the $2,500 figure. According to finding of fact 8, "Defendant orally consented to [the $2,500] amount and no other."

However, Campbell testified that there were additional charges incurred for reconditioning the radiator, replacing coolant and heater hoses, and a variety of other accessory "engine support" items, such as motor mounts, belts, etc. According to Campbell, these items were mentioned to

James as being above the $2,500 estimate, and James was told that to refuse to allow these items to be replaced would interfere with the 1–year warranty on the rebuilt engine. Campbell testified that James authorized the additional work of replacing these items.

According to the findings of fact, James placed numerous telephone calls to Campbell (each of which he documented by producing a typewritten list of calls when he testified), but Campbell did not return his calls. The trial court found that as a practical matter, Campbell was inaccessible to James from early June 1984, until another telephone conversation on June 28 or 29, when Campbell told James that he had located a good used block.

According to the findings, James continued to telephone Campbell, but Campbell was inaccessible until July 19, 1984, when Campbell told James that he had lost a key mechanic and was falling behind the normal 2– to 3–week replacement time frame. James told Campbell that he was in need of a replacement car, so due to the unexpected delay, Campbell offered to pay for a rental car. James rented a car for a few days, incurring an expense of approximately $100. He turned in the rental then, expecting his vehicle to be ready.

The rebuild was completed shortly after the July 19 conversation, but radiator leaks and other problems were discovered upon road testing, and they took about a week to resolve. James admitted that it was around this date that he formed the intent to tender a check in ostensible payment for the repairs in order to get his car back and to stop payment on the check if he thought the amount was unfair. James believed that the amount of the bill should be $2,500 less an offset for the inordinate delay.

The trial court found that at some point during the period from July 28 to August 1, James called and told Campbell that he was leaving on a trip to Australia and wanted his car back and that Campbell told him it could be picked up before he left. However, James testified, and the

trial court found, that James was told the car was not ready when he called to verify whether he could pick it up.

While James was in Australia, he had his nurse call Campbell and ask if she could pick up the car. According to the trial court's findings, Campbell told the nurse that the car was not quite ready, but could be picked up by James on his return. The nurse called a second time, stating that James might be back early, but was told that the car would not be ready before September 4. Campbell's version of these conversations with the nurse was that she wanted to pick the car up and have James pay for it on his return. Campbell told his employee to tell her that the car could not be picked up until James returned.

On September 4, 1984, when James returned from Australia, he went to Northwest Motors to get his car. Campbell presented James with a bill for $256.14 for the first work done—the replacing of the fuel cooler and the oil change. Campbell also presented James with a new repair bill of $3,440.28. There was discussion concerning the rental car expense, and the result of this conversation was that Campbell reduced the bill by $100 to compensate for the rental car and for James' "time and patience". According to the trial court's findings, James examined the bills and manifested his acceptance of the amount stated in them. However, he was angry about the delay and about the amount. James asked if he could pay one–half now and one–half later. Campbell told him that would not be possible, that the whole bill was now due. James then wrote out a check for $3,596.42, which represented the total of the two bills, less a $100 offset for the rental car.

Campbell accepted James' check, and James left with his car. James promptly stopped payment on the check, and it was dishonored by the bank on September 5, 1984. James then wrote Campbell a letter notifying Campbell that he had stopped payment, setting forth his dissatisfaction with the delay and the price, and enclosing a substitute check in the amount of $2,000. Campbell then sent James a notice of

sale/chattel lien threatening to sell James' car to collect for the repairs, but Campbell admitted at trial that this was an idle threat, since he did not have possession of James' car. On January 25, 1985, Campbell mailed James a notice of dishonor, pursuant to RCW 62A.3–515. No payment was made in response to that notice. Campbell then filed suit on the dishonored check.

The matter was sent to arbitration, and the arbitrator awarded Campbell $2,746.42 plus interest of $282.88, and an award of attorney's fees of $2,200, for a total of $5,229.30. Following this award, James made an offer of settlement of $3,500. Campbell rejected the offer as "untimely" because it was made after attorney's fees were incurred and awarded by the arbitrator.

James appealed the arbitration award and received a trial de novo. The trial court issued findings and conclusions as discussed above. Applying its interpretation of the automotive repair act (ARA), RCW 46.71.010 *et seq.,* the trial court held that Northwest Motors' recovery was limited to the $2,500 that it found James had agreed to, minus the $100 offset for the rental car. The trial court found that James' act of stopping payment on the check was justifiable under the circumstances. The trial court decided that the giving of the check did not constitute an accord and satisfaction. The trial court also found that the giving of the check by James was without impact to the resolution of this case and an empty gesture.

Because James had improved his position relative to the arbitrator's award, he was not liable for Northwest's attorney's fees. However, the trial court awarded attorney's fees to James to be paid by Northwest, in the amount of $4,989.80, based on RCW 4.84.270, which allows the defendant to recover attorney's fees if the amount of the judgment in the plaintiff's favor is less than a settlement offer given by the defendant.

This appeal timely followed.

## CHECK GIVEN AS ACCOUNT STATED

RCW 62A.3–515 reads in pertinent part:

(1) Whenever a check as defined in RCW 62A.3–104 has been dishonored by nonacceptance or nonpayment the payee or holder of the check is entitled to collect a reasonable handling fee for each such instrument. When such check has not been paid within fifteen days and after the holder of such check sends such notice of dishonor as provided by RCW 62A.3–520 to the drawer at his last known address, then if the instrument does not provide for the payment of interest, or collection costs and attorneys fees, the drawer of such instrument shall also be liable for payment of interest at the rate of twelve percent per annum from the date of dishonor and cost of collection not to exceed forty dollars or the face amount of the check, whichever is the lesser. In addition, in the event of court action on the check the court, after such notice and the expiration of said fifteen days, shall award a reasonable attorneys fee, and three times the face amount of the check or one hundred dollars, which ever is less, as part of the damages payable to the holder of the check. This section shall not apply to any instrument which has been dishonored by reason of any justifiable stop payment order.

RCW 62A.3–515(1). This statute provides the mechanism by which a creditor may recover when a check accepted by the creditor is dishonored by reason of insufficient funds, stop payment orders, and other reasons. The statute specifically provides that it does not apply to checks that are dishonored *by reason of any justifiable stop payment order*. Neither the statute nor any Washington cases define what is considered "justifiable". However, Black's Law Dictionary defines "justifiable" as:

Rightful; defensible; warranted or sanctioned by law; that which can be shown to be sustained by law . . ..

Black's Law Dictionary 1004 (4th ed. 1968). Thus, it would appear that a stop payment order issued on some legal basis or some other reasonable basis would be justifiable.

We find that the stop payment order in this case was *not* justifiable under a contractual analysis of "account stated". The Restatement (Second) of Contracts § 282 (1981) sets forth the doctrine of "account stated" as follows:

(1) An account stated is a manifestation of assent by debtor and creditor to a stated sum as an accurate computation of an

amount due the creditor. A party's retention without objection for an unreasonably long time of a statement of account rendered by the other party is a manifestation of assent.

(2) The account stated does not itself discharge any duty but is an admission by each party of the facts asserted and a promise by the debtor to pay according to its terms.

Comment *c* to § 282 suggests that an account stated does not itself result in discharge, but is used as an admission of the contents of the account for evidentiary purposes, and operates as a promise to pay.

In *Goodwin v. Northwestern Mut. Life Ins. Co.*, 196 Wash. 391, 83 P.2d 231 (1938), the Washington Supreme Court quoted a previous opinion on the subject of account stated as follows:

"Generally speaking, an account stated is an agreed balance between parties who have had previous dealings involving the payment of, or agreement to pay, money; the account to become stated including an agreement that the items thereof are correct, and that the balance struck is justly due. From such a state of facts, the law presumes a promise to pay the balance as shown on the account. An account stated determines the amount of a debt, some previous liability having existed, and does not of itself create a primary obligation."

*Goodwin*, at 410 (quoting *National Ass'n of Creditors v. Ultican*, 190 Wash. 109, 66 P.2d 824 (1937)).

In *Shell Oil Co. v. Livingston Fertilizer & Chem. Co.*, 9 Wn. App. 596, 513 P.2d 861 (1973), the Court of Appeals set forth the elements of an account stated as follows:

To impart to an account the character of an account stated it must be mutually agreed between the parties that the balance struck thereon is the correct amount due from the one party to the other on the final adjustment of their mutual dealings to which the account relates. The mere rendition of an account by one party to another does not show an account stated. There must be *some form of assent to the account, that is, a definite acknowledgement of an indebtedness in a certain sum. . . .* True, assent may be implied from the circumstances and acts of the parties, but it must appear in some form.

*Shell Oil*, at 598 (quoting *Shaw v. Lobe*, 58 Wash. 219, 221, 108 P. 450 (1910)). *See also Housing Auth. v. Northeast*

*Lake Wash. Sewer & Water Dist.,* 56 Wn. App. 589, 784 P.2d 1284 (1990). According to the *Shell Oil* court, previous defenses available concerning an account are lost upon the finding of an account stated. *Shell Oil,* at 598–99. In his treatise, Arthur Corbin notes that an account stated is conclusive except when attacked for fraud, accident, or mistake. 6 A. Corbin, *Contracts* § 1315 (1962).

Northwest cites a case from another jurisdiction, which appears to be on all fours with the factual situation before us. In *Hansen v. Abbott,* 187 Neb. 248, 188 N.W.2d 717 (1971), the defendant hired the plaintiff to repair a damaged airplane. When the plaintiff presented the defendant with an itemized bill for the charges, the defendant noted that he thought the bill was "awful high", but he nevertheless wrote out a check for the full amount, and gave it to the plaintiff. *Hansen,* at 249. Subsequently, the defendant stopped payment on the check.

The *Hansen* court noted that the defendant did not plead that the check was given as a result of fraud, mistake, or duress. The *Hansen* court found that the circumstances constituted an account stated. The *Hansen* court further noted that the defendant was aware of what he was doing when he paid his account in full, and stated:

> Certainly, one who freely pays an account, even though he has expressed dissatisfaction with it, does so with the intent to assent to it and with awareness that it is a final determination of all matters involved therein.

*Hansen,* at 251.

Applying the law to the facts before us, we hold that James was not justified in stopping payment on the check he wrote to Northwest Motors. Campbell presented James with a corrected bill, showing charges for repair work accomplished, less a $100 credit for the rental of the car. James did not argue about the amount of the bill, and as the unchallenged portion of the trial court's finding of fact 15 states:

> Plaintiff then and there presented Defendant with the earlier repair bill of $256.14 and with the new repair bill of $3,440.28.

Defendant examined the bills and then manifested his acceptance of the amount stated thereon . . ..

The finding does go on to state that James' thoughts were different from his actions, but under the account stated analysis, James' subjective intentions need not be considered.

Northwest cites *Dwelley v. Chesterfield,* 88 Wn.2d 331, 560 P.2d 353 (1977), a case which states that Washington has long adhered to the objective manifestation theory of contracts, meaning that an intention corresponding to the reasonable meaning of a person's words or acts are imputed to him or her. *Dwelley,* at 335. Because the actions of the two parties are conclusive in determining that an account stated was created, James could not later assert his dissatisfaction with the cost of the repair bill as a defense to Northwest's action on the check.

As noted above, once an "account stated" has been established, all previous defenses are lost. *See Shell Oil Co. v. Livingston Fertilizer & Chem. Co., supra* at 598–99. Therefore, any failure on Northwest's part to comply with the ARA need not be considered because James is no longer entitled to raise the issue.

### ATTORNEY'S FEES

With respect to attorney's fees below, we direct the trial court to vacate the attorney's fee award to James. We further direct the trial court to determine appropriate attorney's fees and collection costs award to Northwest Motors, pursuant to RCW 62A.3-515(1). That statute provides for awarding of attorney's fees, $40 in collection costs, and $100 damages.

 Northwest Motors has submitted an affidavit for attorney's fees on appeal pursuant to RAP 18.1. The amount submitted by Northwest Motors' counsel for attorney's fees on appeal is $8,166.37. In this court's judgment, the entire amount of a request for attorney's fees on appeal should not be awarded when the fees are substantially greater than the amount in controversy and the amount

expended by opposing parties on the same litigation. Accordingly, we award Northwest Motors attorney's fees in the amount of $4,440. This represents the amount expended by the opposing party, which we have determined is a reasonable fee for this appeal.

This case is reversed and remanded to the trial court for proceedings consistent with this opinion.

GROSSE, A.C.J., and SCHOLFIELD, J., concurs.

After modification, further reconsideration denied October 1, 1990.

Review granted at 116 Wn.2d 1006 (1991).